**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 17-cv-00751-RM-SKC

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. $8,192.70 HELD IN FIRST BANK ACCOUNT #2026030437;
2. $50,692.95 HELD IN FIRST BANK ACCOUNT #2021245699;
3. $557.10 HELD IN FIRST BANK ACCOUNT #2021248833;
4. $31,821.72 HELD IN FIRST BANK ACCOUNT #2021250811;
5. $71,373.36 HELD IN KIRKPATRICK BANK ACCOUNT #2015009936;
6. ALL FUNDS HELD IN JP MORGAN CHASE ACCOUNT #209158661;
7. ALL FUNDS HELD IN JP MORGAN CHASE ACCOUNT #556396807;
**8. ALL FUNDS HELD IN JP MORGAN CHASE ACCOUNT #806530163;
9. ALL FUNDS HELD IN JP MORGAN CHASE ACCOUNT #630110356;
10. ALL FUNDS HELD IN JP MORGAN CHASE ACCOUNT #630090699;
11. ALL FUNDS HELD IN CHARLES SCHWAB ACCOUNT #72221164;
12. ALL FUNDS HELD IN CHARLES SCHWAB ACCOUNT #39014713;**
13. 4567 MIRA DEL SOL COURT, CASTLE ROCK, COLORADO;
**14. 25892 EAST 5TH PLACE, AURORA, COLORADO;
15. 1152 SOUTH ZENO WAY, UNIT E, AURORA, COLORADO;
16. 2675 SOUTH DANUBE WAY, UNIT 205, AURORA, COLORADO;
17. 21962 EAST CRESTLINE PLACE, AURORA, COLORADO;
18. 2012 DODGE CHALLENGER, VIN 2C3CDYBT4CH101201;**
19. $15,680.00 IN UNITED STATES CURRENCY; AND
**20. 2013 DODGE CHARGER, VIN 2C3CDXGJ9DH514346.**

    Defendants.

___

**ORDER**
___

    In this civil forfeiture action, Plaintiff United States of America (the "Government") seeks to forfeit the above-numbered 8-12, 14-18, and 20 defendant assets as proceeds of illegal narcotics trafficking. Myisha Evans ("Evans") and Vernon Watts ("Watts") (collectively, "Claimants") answered and filed verified claims in response to the complaint, alleging that they

have a possessory interest in the seized assets.[1] Before the Court is the Government's Motion for Summary Judgment. (ECF No. 173.) This Motion is fully briefed and ripe for decision. Upon consideration of the Motion, the applicable parts of the court record, and the applicable law, and being otherwise fully advised, the Court finds and orders as follows.

I.    **LEGAL STANDARDS**

   A.    **Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1273 (10th Cir. 2008). To meet the burden of persuasion required to support summary judgment, the movant must "point to those portions of the record that demonstrate an absence of a genuine issue of material fact, given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Applying this standard requires viewing the "facts in the light most favorable to the non-moving party" and "resolving all factual disputes and reasonable inferences" in its favor. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). "Accordingly, at this stage of the proceedings, [courts] do not weigh the evidence or make credibility determinations, as it is not our office to do so; these are functions properly reserved for the ultimate finder of fact." *$148,840.00 in U.S. Currency,* 521 F.3d at 1273 (citation omitted).

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or "is so one-sided

---

[1] The parties agree that Claimants have filed valid claims to defendant assets identified herein under the Supplemental Rules for Certain Admiralty and Maritime Claims and 18 USC § 983. (ECF No. 173 at 2.)

that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, "the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial." *1-800-Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).

B.   **Civil Forfeiture**

In a civil forfeiture proceeding, the government has the burden of proof "to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1); *United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1273 (10th Cir. 2007). The preponderance standard is met if the government shows that it is "more probable than not" the property is subject to forfeiture. *United States v. $13,000.00 in U.S. Currency, 2007 Black Dodge Ram SRT Pickup, VIN 1D7HA18257S120375*, 858 F. Supp. 2d 1194, 1198 (D. Colo. 2012) (citing *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 622 (1993). In meeting its burden, the "[g]overnment may use evidence gathered after the filing of a complaint." 18 U.S.C. § 983(c)(2).

Here, the Government seeks forfeiture of defendant assets under two statutory provisions: 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A).

1. <u>21 U.S.C. § 881</u>

"Section 881(a)(6) authorizes forfeiture of all proceeds traceable to a controlled-substance exchange and all monies used or intended to be used to facilitate such an exchange." *$252,300.00 in U.S. Currency*, 484 F.3d at 1272. The government, however, "is not required to show that the currency is the proceeds of a particular drug transaction." *United States v. $21,055.00 in U.S. Currency*, 778 F. Supp. 2d 1099, 1103 (D. Kan. 2011). Rather, "the government need only trace the currency to drug trafficking generally." *Id.* at 1104. Property traceable to drug trafficking "includes an asset indirectly exchanged for narcotics in one or more 'intervening legitimate transactions.'" *United States v. Carrell*, 252 F.3d 1193, 1200 (11th Cir. 2001) (citation omitted). For example, "[i]f the seller of drugs uses the cash he receives to buy a bar of gold or a car, that asset is 'traceable proceeds.'" *Id.* In determining whether the government has established a sufficient connection between the assets and drug activity, courts "employ a common-sense approach, and consider the totality of the evidence as a whole and in the appropriate context." *$252,300.00 in U.S. Currency*, 484 F.3d at 1274 (internal citation and quotation omitted).

2. <u>18 U.S.C. § 981</u>

Real or personal property "involved in a transaction or attempted transaction in violation of section . . . 1957 . . . of this title, or any property traceable to such property" is subject to forfeiture. 18 U.S.C. § 981(a)(1)(A). Section 1957 prohibits knowingly engaging in or attempting to engage in "a monetary transaction in criminally derived property of a value greater than $10,000" in proceeds "derived from specified unlawful activity." 18 U.S.C. § 1957(a). "Criminally derived property" is defined as "property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). "Specified unlawful activity" as

defined in section 1956(c)(7) includes any offense listed in 18 U.S.C. § 1961(1) which includes "dealing in a controlled substance." Thus, "the knowledge element of the offense requires that the defendant know that the property in question is 'criminally derived,' although it does not require knowledge that the property was derived from 'specified unlawful activity.'" *United States v. Bornfield*, 145 F.3d 1123, 1132 (10th Cir. 1998) (citation omitted).

## II. BACKGROUND

On March 9, 2017, a grand jury indicted, among others, Watts and Evans for their role in a drug trafficking organization. (ECF No. 164 ¶ 92.) Watts was charged with conspiracy to distribute, or possession with intent to distribute, marijuana of fifty pounds or more, and both Watts and Evans were charged with conspiracies to commit money laundering. (*Id.*) Based on the indictments, local authorities executed multiple search warrants leading to the seizure of cash, drugs, and guns from various members of the organization, including $81,150 from Evans' residence.[2] Concurrently, the Government investigated the financial records of the organization's criminal activity, involving money laundering and tax evasion. (*Id.* at 94.) The criminal charges coupled with the financial evidence were sufficient for the Government to obtain a warrant and seize various bank accounts, real property, and other assets tied to the criminal organization's members. (ECF No. 164-3.)

On March 24, 2017, the Government filed an *in rem* action against those seized assets.[3] Specifically, with regard to Claimants, the Government seeks forfeiture of defendant assets as

---

[2] In all, the Government seized 3,556 marijuana plants, 950 pounds of finished marijuana, two butane hash oil labs, approximately $400,000.00 in cash, 40 firearms, 11 vehicles, one boat, two ATV's, and one tractor. (ECF No. 164 at 93.)

[3] Following its original Complaint (ECF No. 1) filed March 24, 2017, the Government filed an Amended Complaint (ECF No. 41) and a Second Amended Complaint (ECF No. 164). The events described in the background section are from the Government's Second Amended Complaint.

5

proceeds traceable to illicit drug activity under 21 U.S.C. § 881(a)(6) and as property involved in money laundering under 18 U.S.C. § 981. (ECF No. 164 at 258-69, 274-93.)

On August 16, 2017, Evans filed a verified claim (ECF No. 49) asserting an interest in the following seven defendant assets:

(1) $40,427.69 held in JP Morgan Chase Account #630110356 ("JP Morgan #0356");

(2) $114,029.82 held in JP Morgan Chase Account #630090699 ("JP Morgan #0699");

(3) $5,500.00 held in Charles Schwab Account #72221164 ("Charles Schwab #1164");

(4) 25892 East 5th Place, Aurora, Colorado ("25892 E. 5th");

(5) 1152 South Zeno Way, Unit E, Aurora, Colorado ("1152 South Zeno");

(6) 2675 South Danube Way, Unit 205, Aurora, Colorado ("2675 Danube"); and

(7) 2013 Dodge Charger with VIN 2C3CDXGJ9DH514346 ("Charger").

On September 13, 2017, Watts filed a verified claim (ECF No. 54-1) asserting an interest in the following seven defendant assets:

(1) $3,975.19 held in JP Morgan Chase Account #806530163 ("JP Morgan #0163");

(2) $114,029.82 held in JP Morgan #0699;

(3) $15,882.25 held in Charles Schwab Account #39014713 ("Charles Schwab #4713");

(4) 1152 South Zeno;

(5) 2675 Danube;

(6) 21962 East Crestline Place, Aurora, Colorado ("1926 Crestline"); and

(7) 2012 Dodge Challenger with VIN 2C3CDYBT4CH101201 ("Challenger").

Claimants then filed motions (ECF Nos. 31, 55) to stay the civil forfeiture proceeding pending the resolution of their related criminal cases. The Court granted those motions. Following the disposition of Claimants' criminal cases, where Watts pled guilty to distribution of

marijuana over fifty pounds and Evans pled guilty to tax evasion, the stay was lifted on June 29, 2018. (ECF No. 92.)

Discovery resumed and after being extended twice at the Government's request, ended on April 10, 2019. On June 5, 2019, the Government filed this motion for summary judgment. (ECF No. 173.)

### *Undisputed Facts*

In 1989, Watts was convicted of selling rock cocaine in California and sentenced to nine months in county jail.[4] (SUMF ¶ 4.) Watts was arrested a second time on drug charges in 1993 and was convicted of possession of cocaine base with the intent to distribute, subsequently sentenced to 262 months in federal prison. (*Id.* at 2, 4.) In 2008, shortly before he was to carry out his sentence, Watts met Evans through a mutual friend and began what they describe as an on-again, off-again relationship. (*Id.* at 29.) After Watts was released from prison, he moved in with Evans and found employment with Frito-Lay. (*Id.*) He worked for Frito-Lay and in other hourly wage positions for four years, earning between $8,801 and $25,182 per year. (*Id.* at 25.) In 2011, Watts collected a total of $31,174 in unemployment benefits. (*Id.* at 24.) Before his first arrest, Watts worked for a retirement home, earning hourly wages of $4.75 in 1988. (*Id.* at 7.) There are no wage or tax records of Watts' earnings from 2012 to 2014.

In 2014, Watts and Evans founded Watts and Evans Properties, LLC ("LLC") to purchase and renovate properties to sell or rent for a profit. (*Id.* at 30.) Watts and Evans kept scant business records pertaining to the LLC. The only documents discovered by the Government during its financial investigation were tax returns from 2014 and 2015. Those

---

[4] Where "SUMF" is used, it refers to facts undisputed by each party. Thus, "SUMF ¶ 4" refers to an undisputed fact at row 4 of ECF No. 193. Facts referenced with "OSUMF" refers to the opposing party's response to an undisputed material fact, and "RSUMF" refers to the moving party's reply to a fact or evidence.

returns indicate that the LLC had a gross income of $12,175 in 2014 and $37,454 in 2015. (*Id.* at. 36-37.) Even without tax filings from 2016 and 2017, the Government traced deposits during those years from three realty companies into the LLC business bank account totaling $83,090.89 in rental income. (*Id.* at 67.)

Comparatively, the Government discovered Evans had more robust records of verifiable income. Since 2008, she has worked for Vein and Laser Specialists P.C., earning approximately $37,000 per year. (*Id.* at 39.) In 2014 and 2015, Evans filed personal tax returns which confirm her wage earnings as well as report losses from her capital share in the LLC. (*Id.* at 40-41.) Most recently, Evans received a tax refund of $9,343 in 2017. (*Id.* at 76.)

## III. DISCUSSION

The Government traced financial transactions culminating in the seizure of $187,250.24 from Claimants' five bank accounts, parcels of real property purchased for a total of $754,046.29, and two cars purchased for a total of $81,697.60 involving dozens of deposits and transfers between the seized—and numerous other—accounts in either Watts' or Evans' control. The Government argues that the undisputed facts establish by a preponderance of the evidence that these defendant assets are subject to forfeiture as proceeds traceable to or involved in illegal narcotics trafficking. (ECF No. 173 at 1-2.) In response, Claimants allege there is a genuine issue of material fact sufficient to create triable questions for the jury.[5] (ECF No. 180 at 3.) The Court agrees.

---

[5] Claimants also raise a procedural argument in response to the Government's motion. Claimants assert that this forfeiture action is barred by the statute of limitations in their response to the Government's motion for summary judgment. (ECF No. 180 at 7.) A statute of limitations defense under 19 U.S.C. § 1621 is an affirmative defense which must be pled in the claimant's answer. *See United States v. 6 Fox St.*, 480 F.3d 38, 45 (1st Cir. 2007) (affirming district court's finding that the claimant "had waived . . . any statute of limitations defense when he failed to raise that affirmative defense in a responsive pleading"). Claimants first raised this defense in their brief in response to the Government's motion for summary judgment. Claimants did not do so in their answers to the complaint (*i.e.*, responsive pleadings). Having failed to raise this defense in a timely manner, the Court finds Claimants forfeited a statute of limitations defense. In any event, the Court further finds that this forfeiture

A.      **Claimant Watts**

In support of its position, the Government puts forth sufficient circumstantial evidence to meet its initial burden.  First, Watts has been convicted for the distribution of narcotics on two occasions prior to his instant trafficking conviction giving rise to this proceeding.  A claimant's criminal history of drug activity similar to that on which the government basis its theory of forfeiture may establish a sufficient nexus between the seized assets and criminal derivation.  *See United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992) ("A claimant's record of drug activity is a highly probative factor in the forfeiture calculus.").

Second, Watts' verifiable income as shown by his wage and tax returns is inadequate to account for the value of funds and assets seized.  "Evidence of legitimate income that is insufficient to explain the large amount of property seized, unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by the statute."  *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003) (evidence showing $31,142 in legitimate income was insufficient to explain $174,206 seized by the government); *see also $21,055.00 in U.S. Currency*, 778 F. Supp. 2d at 1105 (claimant had insufficient "legitimate income to account for the possession of such a large quantity of currency").  Watts, however, rebuts this showing by proffering evidence pointing to another source of income.

In response to the Government's first set of interrogatories, Watts indicates that in 1992, just before going to prison, he gave James Butts, Sr. ("Butts"), $450,000 to hold and invest in a

---

proceeding was timely filed.  19 U.S.C. § 1621 provides that a forfeiture action must be commenced "within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later."  Here, the Government did not learn Claimants' property was involved in an alleged business pursuit stemming back to 1993 until after the complaint was filed.  Prior to that, records obtained by the Government indicated Claimants had insufficient legitimate income to account for large cash deposits being made into their accounts.  Thus, this action falls squarely within the statutory timeframe.

9

construction company. (ECF No. 173-10 at 15.) Watts claims to have earned the $450,000 through his business venture of buying and selling antique cars in California. (SUMF at 16.) Following his release from prison in 2008, Butts repaid Watts $250,000 of the $450,000. (*Id.* at 17.) Butts then set-up a side "hustle" to buy and sell construction equipment ("Equipment Hustle") in order to generate the remaining $200,000 to repay Watts. (*Id.* at 18.) Keen on the scheme, Watts gave Butts an initial investment of $75,000 to help launch the Equipment Hustle. (*Id.*) In return, Butts would distribute eighty percent of the proceeds to Watts, his silent partner. (*Id.* at 21.) Watts and Butts claim the Equipment Hustle was quite lucrative; from October 2008 to August 2016, Butts made periodic cash disbursements to Watts totaling $1,360,000.[6] (*Id.* at 20.)

      In addition to Watts' sworn testimony regarding his business pursuits, he has submitted deposition testimony from his business associate, Butts, which corroborates his story. Moreover, Watts has provided the following business documents: (1) a written statement from Butts confirming he used a portion of the $450,000 to found a construction business, Central Mississippi Construction, LLC[7] ("MS Construction"); (2) a receipts and disbursements schedule noting the amounts and dates Butts distributed funds to Watts totaling $910,000 return on investment; and (3) an invoice spreadsheet of construction equipment bought and sold through MS Construction by Butts on behalf of Watts. (ECF No. 173-12.)

---

[6] This total disbursement amount includes the original $450,000 plus a $910,000 return on investment. Payments were made on the following schedule: $250,000 in October 2008; $100,000 in June 2009; $100,000 in April 2010; $90,000 in December 2010; $75,000 in May 2011; $60,000 in November 2011; $80,000 in March 2012; $60,000 in August 2012; $40,000 in November 2012; $25,000 in February 2013; $40,000 in June 2013; $30,000 in October 2013; $65,000 in February 2014; $90,000 in October 2014; $50,000 in March 2015; $30,000 in November 2015; $75,000 in April 2016; and $100,000 in August 2016. (ECF No. 173-12.)

[7] MS Construction traces its roots back to R&B construction in which Butts was a partner. Citing differences between his partners, Butts left R&B in 2006 and started Butts Building Service, which was later renamed Central Mississippi Construction, LLC. (ECF No. 173-11 at 10-12.)

In reply, the Government claims that even if the Equipment Hustle generated sufficient proceeds to adequately explain the source of defendant assets, those proceeds are, nonetheless, traceable to drug trafficking as Watts failed to produce records supporting his claim of buying and selling cars in the early 90's. Thus, based on the absence of evidence to support his contention and his drug conviction in 1993, the Government claims Watts earned the $450,000 distributing narcotics.

The Court declines to extend the Government's tracing theory across numerous factually disputed transactions based on circumstantial evidence. While the Court recognizes tainted funds cannot become untainted after being invested in a legitimate business, relying on the absence of business and tax records to establish that the funds are subject to forfeiture in their totality is insufficient in the face of evidence supporting at least a portion of Watts' explanation. Particularly because forfeiture is based on the theory that seized assets are proceeds traceable to narcotics distribution, not profits of tax evasion.

Moreover, the record is void of evidence connecting Watts' $75,000 investment in the Equipment Hustle to illicit drug activity. Proceeds generated through the Equipment Hustle may well be disparate from those alleged to have been derived from narcotics trafficking. What the record demonstrates is that the Equipment Hustle is a plausible source of income to account for defendant assets. A fact finder, when viewing the evidence in a light most favorable to the non-moving party, Watts, could determine that defendant assets were derived from a legitimate, non-drug related source. *See United States v. One 1980 Rolls Royce, VIN No. SRL 39955,* 905 F.2d 89, 91–92 (5th Cir. 1990) ("we conclude that a court should not grant summary judgment and permit the complete forfeiture of all properties when there is evidence that the properties were purchased at least in part with legitimate funds"). Reasonable minds could differ on this point,

which indicates Watts has done more than make bare assertions as to an unlikely legitimate source of income; he provides evidence through Butts' testimony substantiating his assertion. *Cf. $13,000.00 in U.S. Currency, 2007 Black Dodge Ram SRT Pickup, VIN 1D7HA18257S120375*, 858 F. Supp. 2d at 1202 (finding claimant's unsubstantiated statement "that he had been buying and selling cars on his own" insufficient to establish a genuine dispute of material fact regarding his legitimate income).

On the record, there remains a genuine dispute as to a material fact which precludes summary judgment. Thus, the question of which portion of the seized assets were generated from legitimate income is a question for the jury at trial. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

   **B. Claimant Evans**

Evans also presents sufficient evidence to rebut the Government's showing that her documented income and tax returns fail to account for the sums of money deposited into her bank accounts. Specifically, Evans' states that the unsourced funds in her seized accounts are comprised of casino winnings and money from her family. (ECF No. 180 at 8-9.) In reply, the Government argues that it is incongruent that Evans would need financial assistance from family when Watts was depositing thousands of dollars into her accounts. (ECF No. 192 at 10.)

Evans claims that she regularly received money from family members and had considerable gambling winnings from the casino which account for the unsourced cash and money order deposits into her accounts. Evans concedes that she does not have documentation showing the amounts of money nor the dates on which money was gifted from her mother,

Barbra Evans ("Barbra"), and brother, Alvin Evans ("Alvin"), because these were "arm's length" transactions between trusted family members. Evans, however, proffers affidavits from Barbra and Alvin which confirm they often gave Evans money to help pay her bills and mortgage and did not keep records of those transactions. In her affidavit, Barbara states she provided her daughter financial support as needed in the form of cash, pointing to multiple income sources that justify her ability to provide such support. (ECF No. 180-1.) Alvin makes similar statements in his affidavit, especially referencing his $9,000 cash gift to help Evans purchase her Charger. (ECF No. 180-5.)

It goes without saying that parents often provide financial support to their children without keeping business records of such transactions. The Government's position also has merit; when parents provide financial support with the frequency and quantity claimed to have occurred here there would be at least some record or trail to legitimize the gifts or loans. Ultimately, reasonable minds could well differ on this point. On summary judgment, the Court does not make credibility determinations. Weighing the veracity of Barbara's and Alvin's statements and the inferences to be drawn therefrom are functions for a jury. *See Anderson,* 477 U.S. at 255. Thus, the Court finds Evans has raised a genuine issue as to the portion of seized funds which were legitimately derived. *See One 1980 Rolls Royce, VIN No. SRL 39955,* 905 F.2d at 91–92; *see also United States v. $10,560.00 U.S. Currency*, No. CV-08-033-LJQ, 2009 WL 854637, at *3 (E.D. Wash. Mar. 30, 2009) (denying summary judgment where claimant produced affidavits from family supporting his explanation as to his intended use of a large sum of cash because "the explanation given raise[d] issues of fact supported by deposition testimony").

With regard to 25892 E. 5th, the Government proceeds under the theory of forfeiture that the property was used to launder drug proceeds. To prove its theory, the Government must demonstrate: (1) Evans engaged in a monetary transaction over $10,000; (2) she knew that 25892 E. 5th was purchased with funds derived from criminal activity; and (3) the funds used to acquire 25892 E. 5th were actually derived from specified unlawful activity. *See United States v. Richard,* 234 F.3d 763, 768 (1st Cir. 2000). If the Government makes this showing, both the legitimate funds and drug proceeds invested in the home would be "commingled" and, thus, the entire home would be subject to forfeiture. *See United States v. One Single Family Residence Located at 15603 85th Ave. N., Lake Park, Palm Beach Cty., Fla.*, 933 F.2d 976, 982 (11th Cir. 1991) (holding "that when a claimant to a forfeiture action has actual knowledge, at any time prior to the initiation of the forfeiture proceeding, that claimant's legitimate funds are commingled with drug proceeds, traceable in accord with the forfeiture statute, the legitimate funds are subject to forfeiture").

Here, the Government traced a down payment of $51,000 on 25892 E. 5th to the sale of Evans' previous residence. The Government also traced $194,106.33 from JP Morgan #0699 to pay off the mortgage on 25892 E. 5th. It is undisputed that the $51,000 constitutes legitimately derived funds, but there remains a genuine dispute as to the source of funds in JP Morgan #0699.

Regardless of whether funds in JP Morgan #0699 are traceable to narcotics trafficking, using $194,106.33 to satisfy the mortgage on a property constitutes a monetary transaction in excess of $10,000. However, even if it had been summarily established that funds contained in JP Morgan #0699 were traceable to narcotics trafficking, there is a genuine question as to whether Evans knew the funds were criminally derived. The Government relies on two strands of circumstantial evidence to prove Evans knew funds used to purchase her home were illicit

drug proceeds. First, when Evans met Watts in 2008, she was admittedly aware that he was serving time for a drug-related offense. Second, Evans was implicated in the underlying drug bust to this forfeiture proceeding. At the same time, Evans testified that the funds Watts contributed to JP Morgan #0699 were generated from the Equipment Hustle and she was under the reasonable impression that those funds were not derived from criminal activity. Evidence adequately supports this contention.

On the record, reasonable minds could well differ as to whether Evans had actual knowledge that funds used to acquire her property were from an illicit source. Further, as noted previously, there remains a genuine dispute as to the source of funds contained in JP Morgan #0699. Accordingly, a jury could find 25892 E. 5th is forfeitable in part, in its entirety, or not subject to forfeiture based on the current record. *See United States v. $688,670.42 Seized from Regions Bank Account No. XXXXXX5028*, 449 F. App'x 871, 876 (11th Cir. 2011) (declining to resolve the issue of a claimant's knowledge regarding the source of fraudulent checks at the summary judgment stage "when the Government presented no direct evidence that [claimant] knew the checks . . . were criminally derived").

## IV. CONCLUSION

Based on the foregoing, the Court ORDERS that the Government's motion for summary judgment (ECF No. 173) is DENIED.

DATED this 24th day of November, 2020.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge